23-7087. Good afternoon, and may it please the Court. My name is Rebecca Shepard. Together with Wes Bryant, we represent the defendant, George Smith. And I would note that it is my intention to reserve three minutes for rebuttal. This Court should reverse Mr. Smith's convictions for three reasons. First, despite the jury's verdict, the evidence was legally insufficient to support a conviction for a first-degree murder. Specifically, the evidence was insufficient to establish that Mr. Smith was the shooter or that he acted with premeditation or malice aforethought. Second, the government knowingly presented perjured testimony to the jury on a critical fact. And third, the District Court abused its discretion by mishandling the jury misconduct issue. Unless the Court prefers otherwise, I will begin with the insufficient evidence. In this case, the government failed to present sufficient evidence at trial to establish beyond a reasonable doubt that Mr. Smith was the shooter. Even if this Court were to find that there was substantial evidence that he was the shooter, there was not sufficient substantial evidence that he acted with premeditation or malice aforethought. What about the fact that he shot him twice in the back of the head while he was sitting? It was not established at trial that the victim was sitting. That was an argument that the government made during closing argument. But he was shot in the back of the head? He was shot in the back of the head. But the government did not introduce any evidence to establish. I don't believe that that fact alone establishes premeditation or malice aforethought. That was the government's only evidence that went to those two essential elements. And it is our position that in the absence of any other evidence, that does not constitute that requisite substantial evidence. And specifically, the government relies on inference and supposition. It is their theory that shooting someone from behind is evidence of premeditation or malice aforethought. But that relies on an inference. It relies on a supposition that Mr. Arthur was not shot from behind due to some other reasons, such as accident or mistake or confusion or impulse. Could it be an accident when it's just a couple feet from the defendant and shoots him in the back of the head? Well, when we don't know, again, we don't know where the shooter was. We don't know exactly where Mr. Arthur was. And the evidence also supported that the different trajectory of the two shots indicated that either the shooter was in motion or the victim was in motion. And so it could have been the case that the shooter was recklessly discharging a gun and Mr. Arthur stood up in the path of the bullets. That is also something that could have happened. And so the government's case, again, relies upon the jury to speculate and relies upon conjecture as to what the fact of the location of the shooter being behind Mr. Arthur, what that means. Ms. Shepard, I want to ask you, in the briefing, both sides seem to combine malice of forethought and premeditation, and rightly or wrongly, I'm viewing those issues entirely differently. Malice of forethought, you say, well, it could have been an accident. Well, he had multiple theories, one intruder, two intruders. He never says it's an accident. And so he says that it was an intruder. And so can't we reasonably infer, viewing the evidence of the like most favorable to the prosecution, that it wasn't that he was just pointing a weapon aimlessly, that we can infer that it was a deliberate act in intent, may not have been premeditated, may have been, but a deliberate, wherever it was, to the head. It was a shot to the head. Can't we reasonably infer that it was a deliberate act for malice of forethought? I think that, again, Your Honor, the government conflated those issues at trial, and it pointed to the same evidence as to both. For me, I want to just unpack those. I appreciate that, Your Honor. I think that, again, it is our position that that is still an inference. And while this court has said that it is okay for juries to make reasonable inferences, they do have to be reasonable. And so that is a question for the court, whether that inference on its own with nothing more, no motive, no reason for Mr. Smith to bear any ill will towards Mr. Arthur or to have any interest in his injury or death to make that inference. And Mr. Smith's position that he's maintained throughout trial is that he was not the shooter. And, again, that's also an issue here, that there was the physical evidence in this case supports a not guilty verdict. It, in fact, does not support the sufficiency of the guilty verdict, including that there was no gunshot residue evidence not only on Mr. Smith's body but also on the clothing that he was wearing and the clothing that law enforcement obtained from his house. When there were both government expert witnesses and fact witnesses who testified that gunshot residue would be expected to be found on the person and clothing of the person who was the shooter, there was no blood spatter or DNA evidence on Mr. Smith's body or on any of those clothing. When there was expert testimony that the entry wound would have produced back splatter blood that would have been expected to land on the shooter's body or clothing, there were no fingerprints. There was a shell casing retrieved that was believed to be from one of the bullets. There was no fingerprints of Mr. Smith on that shell casing, and there was no murder weapon recovered. And the timeline established he did not have an opportunity to dispose of that. And so this goes to the first issue, whether he was the shooter. Yes, Your Honor. Well, how can a jury reasonably, even generously, infer that his explanation was accurate? There's two doorways to this little house. The back door, which opens inside, there's a dresser preventing ingress from the back door so that one or two masked intruders have to enter from the front door. It doesn't go to the kitchen where he and Mr. Arthur are allegedly playing cards. It goes into the living room. And so these masked intruders have to be very, very fast. They have to run in, go past the living room, go into the kitchen, make two shots, pick up one of the casings, and vanish before Mr. Smith can identify them, before he sees anything. In itself, sufficient to reasonably infer that one or two things happened, at least according to the trial evidence and the arguments. Either there was one or two Superman-speed people that just go in lightning quick, or he shot them. Understandably, Your Honor. And I would also just note as a logistical matter, it's presented in the briefing, the government's briefing, as though these were separate rooms. This was, in fact, an open space, and the distance and the jury saw it. I don't see that. I mean, they're separate rooms. You're saying that kitchen is the same as the living room? It is an open doorway, and the distance, the physical distance from the door to the kitchen table is approximately the same distance as from me to you, in terms of actually that is the distance. So it is not multiple doors. I get that. They're two rooms. Yes, but with an open passageway between. Sorry. Again, Your Honor, I think it's also, I take your point on that, but I think that there are these three necessary elements, and it is our position that the evidence was not sufficient, in terms of it being that substantial, reliable evidence that does not depend upon conjecture and supposition Stop there, because I'm always interested when I hear the piling, because I'm not sure I really understand what it means. What inference piled on another inference piled on another inference here? I think, well, speaking to the issue of the malice of forethought and premeditation being based entirely on the location of the shooter to the victim, we have no information other than that, that the victim was shot from a shooter who stood behind him. That's the only information we need. From there, the government takes the position that Mr. Arthur was seated, that he did not know that Mr. Smith was behind him, that Mr. Smith stood there and thought about it and pulled the trigger, that it was done intentionally. All of these things for which there is absolutely the only piece of actual evidence is that the shooter was behind Mr. Smith. And again, we do not know. I mean, there could be, it could be accident. It could be a belief that someone was entering the home that caused the shooter to shoot. It could be all sorts of things, but it is inference upon inference upon inference to create this argument of an execution-style intentional shooting for which there is no evidence other than this one fact, shot from behind. Well, there are a lot of inference drawn, but they all go back to the same question, which is who done it? I don't see how they build an inference from an inference from an inference. Again, Your Honor, and it's our position that the evidence is insufficient as to who done it. But even if this court disagrees with that and believes that Mr. Smith was the person who was the shooter, we maintain that there is insufficient evidence as to premeditation and malice aforethought based only on the simple fact of the shooting occurring from behind. Is there ever a case then without an eyewitness that doesn't suffer the same defect you're alleging here? Well, I think looking at the cases that were cited in the briefs, the example of the Therese Wilson case was a case where there was no eyewitness and no forensic evidence. But the difference in that case was there had been prior admissions by the defendant who then recanted at trial, and his admissions lined up with the physical evidence and the forensic evidence, including that he described where the murder took place, where he disposed of the body, and the means of death, and it all lined up. So, yes, there can be if there is other evidence that the jury can point to or can rely on. I do want to, because I only have three minutes left, I did want to at least briefly discuss these other issues, including the jury misconduct issue and the courts essentially, and I'm going to try to be very quick here because of the time, but there were two improper topics of investigation that this juror, PB, engaged in. He spoke with a third-party attorney and apparently had conversations with that attorney related to the process of the jury's deliberations, but also the legal definitions of matters that were pertinent to the jury's deliberations and about which they had sent out a jury question the night before. It's our position that the district court abused its discretion in severely limiting defense counsel's ability to investigate these issues, and now on appeal the government argues that there's not evidence of an improper effect of this misconduct, but the reason why there is not that evidence is because we were prohibited from investigating, including we were not given the opportunity to have a hearing where we could speak to that third-party attorney and learn more about what the conversation was. There were discrepancies between what she told the judge and what the judge told counsel, and then what the juror told the judge. So we had the two people who were involved in this conversation who gave different accounts of the conversation, and counsel did not have the opportunity to test that in a hearing. What were the different accounts that were important? The third-party attorney described a five-minute conversation. She referenced questions going to both the process and the legal issues. When PB was questioned by the judge, he minimized the conversation, said it was no more than a minute and a half, and denied asking about the legal definitions, at least initially. He said he was only or no, excuse me, I think he denied talking about the Allen charge or the potential jury process. And the questioning of the other jurors was limited to only asking if they knew that PB had brought in information from this other, this outside party, which they would only have had that information if PB had confessed to it when all the evidence showed that PB was attempting to hide his misconduct. And I'm out of time. We'll stop your clock, Robert. Stop your clock. Do you have any other questions? Okay, thank you. Good morning, Your Honors. May it please the Court. Lisa Williams representing the United States of America. I'd like to talk about the sufficiency of the evidence first and correct some of the record. Starting with that there was no evidence that Mr. Arthur was sitting when he was shot. That's directly belied by the evidence in this case. If you take a look at Government 42 and Government 44, these are pictures of one of the dining room chairs, and you clearly see blood poured down through the front of the chair and the back of the chair. And there is no reasonable way that blood could get on that chair in that pattern if Mr. Arthur was somehow standing away from the chair when he shot. He has to be sitting in the chair because of how the blood then ends up on the chair. I don't know that anybody's ever questioned that, Ms. Williams. I think the question is whether or not Mr. Smith was standing or seated. Obviously, Mr. Arthur, I don't think there's ever been any dispute that he's in that chair that has a bunch of blood on it. Oh, I'm sorry, Your Honor. I think defense counsel specifically questioned that when she was answering Judge Phillips' question about inferences on inferences. She said the only evidence was that he was shot from behind. We don't know if he was standing or sitting or where he was when he was shot. She said the only thing that we know for sure is that he was shot from behind, and that's simply not true. Based on this evidence, we know he's also seated. I guess the question I have is, well, what evidence is there one way or another about whether Mr. Smith was seated or standing and where he was standing in that kitchen when he decided to shoot Mr. Arthur? That's a great question, too, Your Honor, and I think there's evidence of that in the record. You can look at Government Exhibit 9, which I believe you also have on hand. That's the layout of the front living room to the kitchen. And if you peer through that arch, you can kind of see how the chairs are positioned around the table. So this is an oval-shaped dining room table. There are six total chairs in the room. You have two on each side and one on the ends. Three of the chairs are untouched. The two chairs with their backs facing the door haven't moved, and the chair far away on the window hasn't moved. The other three chairs are moved, and they have blood on them. So those are the three chairs involved in the shooting where everyone was sitting. And we don't know which chair Mr. Arthur was sitting in. That's because the defendant says he doesn't remember, but it's one of those three. And if you look at where those three chairs are positioned, right, there's no way that the defendant could have been sitting in a chair to shoot Mr. Arthur from behind based on the three chairs that are in play. He has to be standing behind Mr. Arthur when he shoots him. When he shoots him? Yes. Right. No question. So when he's standing or sitting, how do you know what was going in Mr. Smith's brain when he decided to shoot him? Was he over near the stove? Did he say, you know, I'm going to go boil some spaghetti. I'm going to go get a bottle of water out of the refrigerator. And Mr. Arthur made some smart aleck remark, and he pulled out his .25 and shot him. How do we know where Mr. Smith was when he decided to shoot him? Well, how do we know where he was in his head? We don't know. But that's evidence of motive, which the government obviously doesn't have to prove. You do have to show premeditation, however. We do. That's absolutely true. And malice of forethought. So that's what we have to prove. And malice of forethought, of course, is killing a person deliberately and intentionally. And what we do know is that Mr. Smith is standing behind Mr. Arthur when the shooting takes place. Again, based on the bullet trajectory. I agree on malice of forethought. Okay. Then I'll skip that. So then premeditation, of course, is the result of planning or deliberation. That's what the government has to prove in order to get that element established. And again, the argument here is the standing behind him, the drawing of the weapon, the aiming, the firing, the aiming, the firing. That's enough. That's that twinkling of an eye. But that is sufficient evidence to establish premeditation. So based on that, so let's say hypothetically I'm armed. And let's say Judge Phillips, as he frequently does, says something to make me really, really mad. And I pull out my gun and shoot him. So that's premeditation? No, that's not. That could be a heat of passion, killing. Yeah, so how do we know which one of these works? So, again, in this case, you pull out and you shoot him where he's standing, right? You don't stand up and walk behind him and then fire your gun. I would submit that if Judge Phillips in this scenario made you mad and you shot him, but you did so by positioning yourself in a deliberate place where you can make a shot that extracts a high degree of likelihood that you're going to kill him. That's the premeditation necessary. Even if I shoot him in the head and I happen to be behind him when I shoot him, even if Mr. Smith happened to be behind Mr. Arthur when he got mad and pulled out his gun and shot him, that's premeditation, even though it was immediate. Well, there's no evidence that somehow Mr. Arthur made Mr. Smith mad and that's why he shot him. That's lacking. And Mr. Smith never testified that that's how he did it. Nobody testified about any of this. Well, that's... If somebody would testify about any of this, we wouldn't be here. Well, we did have testimony that the two men were playing cards at the table. So that's the setup, is that they're sitting at the table together. And evidence suggests that, right? There's a deck of cards on the table. Even though there's no deck of cards on the table. There's deck of cards on the table. There's a bottle of Jack. There are? I didn't see it. You say in those pictures there are? Yes. Your Honor, if you look at those, there is, in fact. Now, it's not spread out. They're not in the middle of a card game. But there is a deck of cards sitting on the table. There's a bottle of Jack. And it does seem that the two men were playing cards at the table. And then at some point in time, Mr. Smith stands up, gets behind Mr. Arthur, and puts two in the back of his head. And given the manner in which and why Mr. Arthur is still seated. So they're not in some sort of fight. They're not in an argument where they're standing and confronting each other in the kitchen. Mr. Arthur is sitting in that chair with his back towards Mr. Smith when Mr. Smith shoots him. And that was sufficient evidence. It's certainly not the strongest evidence of premeditation the government's ever had in any history of its case. But it is sufficient for the jury to find premeditation in this case. I also wanted to touch upon putting this in the light of the standard of review here. So what the defense is asking this court to do is to make inferences that the shooter was recklessly shooting and Mr. Arthur somehow got in the path of the bullet, that it was an accident. But given our standard of review, this court cannot reach an inference that is not based on any evidence. The government would submit that's unreasonable. The court has to make all the reasonable inferences that weigh in favor of the jury's verdict under our standard of review. And reaching a conclusion that some fact pattern happened where there's no evidence of it in the record cannot be a reasonable inference that supports the jury's verdict. So when the defense asks the court, oh, there's all these other ways, this court on this level of review shouldn't engage in those types of hypothetical maybes because they're not reasonable and they don't support the jury's verdict. I also wanted to correct the record. The victim's blood was in fact found on Mr. Smith's clothing that night. That's at the trial testimony at 464 to 466. They did DNA analysis. They actually seized two different pieces of clothing. He had gray sweatpants on that night. They also seized from Mr. Smith jeans from his bedroom. Mr. Smith's blood alone was on the jeans, but the victim's blood along with Mr. Smith's blood was on his sweatpants that he was wearing that night. So there is evidence. She was talking about the blood splatter. We would have seen that. Well, there was in fact blood on his clothes. What kind of shirt? That's a great question, Your Honor. I can't recall what kind of shirt. I know he had sandal shoes on, sweatpants. Short sleeve, long sleeve? Because he had time to clean up. Well, and that brings me to another so much time to clean up. But if you're wearing a long sleeve shirt and you shoot from within four feet, I assume there might be some blood there, something at least to consider. There could be. It's a little tough because there's also blood on the ceiling. There's blood on the fridge. There's blood on the floor. So there was an aggressive zone of blood splatter as a result from the shooting. And I understand the point you're making, Your Honor, is that we would then expect if you're holding the gun that some of that blowback would hit the shirt. But I think that you hit the nail on the coffin where whatever shirt he had on when police arrived, who knows if that's the actual shirt he was wearing when the shooting took place. And let's talk about that timeline for a second because Lena Anderson, first of all, she gives a few different conflicting accounts. But under all of her testimony, she at some point wakes up and she goes to the bathroom and she's there for 10 or 15 minutes. And she wakes up to either the gunshots or immediately after the shooting takes place. So he's got 10 to 15 minutes to clean up while she's in the bathroom. Then she comes out and they call 9-1-1. 9-1-1 gets called at 10-04. Dispatch, the 9-1-1 operator says she doesn't dispatch anybody until 10-10 and then the officers arrive a few minutes later. Defendants are already outside when they arrive. So he's got some additional time if he has items of evidence on him like a shell casing to go outside and dispose of that. Maybe there's extra clothes in the shed. But he has a significant amount of time. And we know at least during some of that time he gets the tarp, he puts the body on the tarp, and then he pulls that into that front living room area. Do we know that the .25 was in the home at any point? I don't think that's in the record, Your Honor. The .25, he had possession of the .25 when they went to pawn it. They returned to the home. But I don't think anyone, because it would only be Lena that could put him with the gun in the house since Mr. Arthur is deceased. And I don't think the record supports that. Just, of course, the .25 caliber ammunition that was found in the home. So turning to, unless there are more questions about sufficiency, turning to the issue of the jury misconduct. Your Honors, it doesn't really matter who said what between PB and Underwood, the attorney, that there are discrepancies about that conversation isn't really the focus of the analysis. The focus of the analysis is what did the remaining jurors learn about that conversation, if anything? And so there would frankly be no point in bringing in Underwood to have her talk about what she and PB talked about when the relevant inquiry is, okay, we're getting PB off the jerk. He's gone. Did he relay any improper information to the rest of the jury pool so that they have had outside influence injected into their deliberations? And there's simply no evidence that he did. He said he didn't. The foreperson said that he didn't. And the third juror, I believe it's ABJ, she also said that he didn't. Did he have any information to inject? Well, and that's another argument the government makes in the brief. The government's position is no. I mean, they had this very strange conversation where Underwood is, and she says, I'm struggling to understand what he was talking about. I didn't really, and so I kept asking him questions like what did he mean. The she being the attorney. Yes. He calls him an attorney. That's the problem. Yeah, well, I mean, he also lied about it to your honor. I mean, I don't want to downplay the problems with what PB did. Like he violated several parts of his oath as a juror. But he calls her trying to get information. And if you hear what Underwood the attorney says is, I didn't understand what he was talking about. I said, are you talking about an Allen charge, which he wasn't. If you kind of follow it through, right, he's looking for that phrase a distinction without a difference, which then if you marry it up with some of the things that the jurors talk about later, right, they describe, the defense describes him as a leader. But I would say he's not a leader. He seems to kind of be the annoying juror, right, Well, they say he's a questioner. He's a questioner, right. Exactly. Your honor, because he's not taking a position. He's not trying to tell the other jurors like we should decide this way. What they say is like, he wants us to prove why we're right. And he's always questioning us. And he's always making us explain why we're right. That's that's who this guy is. So he's not like leading them to a certain conclusion. He's just making them answer a lot of questions. And you can tell the other jurors are getting fed up because they also talk about that conversation in the morning, right. We did have a conversation. It was about the process. It was about what we were going to do to move forward to discuss this case because of like how annoying they found PBS. Are there times when a court needs to talk to every juror? Oh, I'm sure there are, your honor. I mean, I would never stand up here and say no, absolutely not. But I think that, and if I may answer, I see I'm out of time. Please do. I think that the court is rightly concerned with moving the proceedings along, getting them back on track, getting them back to deliberating. But also, you know, if you look at the questioning of the poor person in ABJ, the court starts off by trying to be vague. And then it's like, okay, sorry, like here's what happened. And I think there's an argument that if he went through, if the judge went through and told every single juror what happened, right, that's putting more extraneous information into that jury pool that doesn't need to be there because then they all, like is it like the hot gossip of the jury room and they're all talking with each other, oh, PBJ, calling an attorney. Like that is a distraction. And at that point, I think there are even more concerns about what's going on in the jury room if they're all focused on the events of PB instead of deliberating in this case. So just one last question. How long did the jury deliberate? Oh, gosh, Your Honor, I'm so sorry. I usually actually have that question, that answer ready to go. They did return a verdict later that day, and this all went down. They stopped deliberating at 11 a.m. They fixed it all, and they got a verdict in that day. So I would say at most five hours, but knowing lunch and getting the alternate there are probably less than an additional five hours. Thank you, Your Honor. Your Honor, I can answer that question. The time between the misconduct and the stopping of the jury, so the time of deliberation with the influence of the improper information was about between an hour and a half to two hours. At that point then, the judge stopped it. When PB was removed and a replacement juror was placed on the jury, the jury was instructed to disregard all prior and start deliberations anew. The entire time of deliberations was one hour and 41 minutes. So essentially the entire deliberations that led to a verdict was almost the same as the tainted time period. Just briefly addressing this jury misconduct issue, it's unclear to me how the government can represent what the conversation was with such conviction when we did not have the opportunity to explore. And the judge himself in the transcript on page 699 to 670 specifically says in reference to the text message from the third-party attorney that he didn't understand. I don't understand that is what he said. So he didn't understand exactly what he was hearing from the attorney that the conversation had been. And then, of course, PB comes in and attempts to minimize and prevaricates on what it was. But what we do know is that the government makes the point that the issue is whether or excuse me, the issue is not whether the jurors knew that PB had spoken to the outside attorney. The issue is whether the information that PB got from that outside attorney was introduced into deliberations. And we know that he asked that attorney about some of the specific definitions, one versus two seems to me to imply first degree versus second degree murder, and also that he asked about premeditation and malice of forethought. And that was the exact topic of the jury questions. And the jurors who were voir dire, the two jurors that the court did question, did say that they had spoken about that issue that morning. So the jury conversation during that at least hour and a half of when the taint was present did discuss the same topic that he had talked about with the third-party attorney. Counsel, I think Judge Seymour has a question. Yes. What specifically did they talk about that was discussed? Do we know that? The jury question was about premeditation and malice of forethought. PB spoke, asked questions related to that to the third-party attorney, and then when the jury restarted deliberations, they spoke about those same topics. I did just want to address- I hate to be picky, but you're about two minutes over time. Okay. Thank you. She's going up. Thank you very much, both counsel. Your arguments in your briefing and your arguments today were excellent, and we so appreciate it. Court is adjourned, subject to recall.